

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| MISSOURI DEPARTMENT OF<br>SOCIAL SERVICES, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | WD78159 |
| | ) | |
| GWENDOLYN BEEM, | ) | Opinion filed:  October 13, 2015 |
| | ) | |
| Respondent. | ) | |

**APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION**

Before Division Two:  Thomas H. Newton, Presiding Judge,
Victor C. Howard, Judge and Mark D. Pfeiffer, Judge

The State of Missouri, Department of Social Services ("DSS") appeals the decision of the Labor and Industrial Relations Commission awarding workers' compensation benefits to Gwendolyn Beem.  DSS argues that Ms. Beem's injury did not arise out of and in the course of her employment with DSS because Ms. Beem was on break when the injury occurred and because the extension of premises doctrine did not apply because DSS allegedly did not control the parking lot where the injury occurred.  DSS also contends that Ms. Beem failed to prove that she was not equally exposed to the risk or hazard causing her injury in her nonemployment life.  The judgment is affirmed.

## Factual and Procedural Background

Ms. Beem worked for DSS at the time of her injury. DSS allowed, but did not require, its employees to take a fifteen-minute paid break in the morning and afternoon, during which employees were allowed to leave the premises. On February 1, 2010, Ms. Beem took a break around 10:00 a.m. to go home and let her dog out. Ms. Beem exited the building and walked across the parking lot toward her car. The parking lot had been plowed and the snow was piled on the sidewalks. Snow from a pile on the sidewalk had melted and refrozen on the parking lot. Ms. Beem slipped on this ice on the way to her car, suffered a broken ankle, and required surgery to repair the ankle.

## Standard of Review

The Missouri Constitution, Article V, Section 18 provides for judicial review of the Commission's award to determine whether the award is "supported by competent and substantial evidence upon the whole record." Section 287.495.1 further indicates:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
> (1) That the commission acted without or in excess of its powers;
> (2) That the award was procured by fraud;
> (3) That the facts found by the commission do not support the award;
> (4) That there was no sufficient competent evidence in the record to warrant the making of the award.

"The constitutional standard ('supported by competent and substantial evidence upon the whole record') is in harmony with the statutory standard ('sufficient competent evidence in the record')." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003). Thus, "[a] court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Id.* at 222-23. The Commission is responsible for

2

determining the credibility of witnesses and the weight and value to be given to evidence, and such determinations will not be disturbed on review unless they are against the overwhelming weight of the evidence. *Tilley v. USF Holland Inc.*, 325 S.W.3d 487, 491, 495 (Mo. App. E.D. 2010).

## Discussion

DSS argues that Ms. Beem's injury did not arise out of and in the course of employment because (1) Ms. Beem was on break when the injury occurred, and (2) the extension of premises doctrine did not apply because DSS allegedly did not control the parking lot where the injury occurred. The Commission found that because "[t]he unrebutted testimony of [Ms. Beem] establishes that [Ms. Beem] slipped while she was walking to her car to depart her place of employment[,] [t]he extension of premises doctrine applies in this case." The Commission further concluded that DSS controlled the parking lot and that it was part of the customary, expressly or impliedly approved, permitted, usual and acceptable route or means employed by workers to get to and depart from their places of labor, so as to meet the limitations of section 287.020.5.

**Extension of Premises Doctrine**

Ms. Beem's injury is compensable even giving due consideration to the undisputed fact that she was traversing the parking lot of her own accord as part of a paid break, not mandated by DSS, during which she intended to leave DSS's premises to go home and let her dog out.

Prior to 2005, injuries were not deemed to have arisen out of and in the course of employment unless they happened while employees were "engaged in or about the premises where their duties [were] being performed, or where their services require[d] their presence as a part of such service." § 287.020.5, RSMo 2000.

3

Courts subsequently developed what came to be referred to as the "extension of premises" or "extended premises" doctrine as an exception to the general rule of noncompensability of injuries occurring on the trip to or from work. *Scholastic, Inc. v. Viley*, 452 S.W.3d 680, 683 (Mo. App. W.D. 2014). The doctrine specified that such injury arose "out of and in the course of" employment if (1) it occurred on premises that were "owned or controlled by the employer" or "have been . . . so appropriated by the employer or . . . so situate, designed and used by the employer and his employees incidental to their work as to make them, for all practical intents and purposes, a part and parcel of the employer's premises and operation" and (2) "that portion of such premises is a part of the customary, expressly or impliedly approved, permitted, usual and acceptable route or means employed by workers to get to and depart from their places of labor and is being used for such purpose at the time of injury." *Id.* at 683 n.3 (quoting *Wells v. Brown*, 33 S.W.3d 190, 192 (Mo. banc 2000)).

The Workers' Compensation Act was amended in 2005, limiting its scope and construction. *Viley*, 452 S.W.3d at 683. The extension of premises doctrine was "abrogated to the extent it extend[ed] liability for accidents that occur on property not owned or controlled by the employer even if the accident occurs on customary, approved, permitted, usual or accepted routes used by the employee to get to and from their place of employment." § 287.020.5, RSMo (Cum. Supp. 2005). The 2005 amendments also require the Workers' Compensation Act to be strictly construed, thus the extended premises doctrine is "not totally eliminated but is now limited to situations where the employer *owns or controls* the area where the accident occurs." *Viley*, 452 S.W.3d at 684 (emphasis in original). For purposes of our application of the extension of premises doctrine, "control" is given its plain meaning: "'1. To exercise power or influence over .... 2. To regulate or govern.... 3. To have a controlling interest in.'" *Hager v. Syberg's*

4

*Westport*, 304 S.W.3d 771, 776 (Mo. App. E.D. 2010) (quoting BLACK'S LAW DICTIONARY (8th ed. 2004)).

Because extension of premises cases involve injuries sustained before or after the actual performance of job duties, the legislature clearly contemplated and accepted compensability of injuries sustained as a result of work-related risks even though employee was not engaged in the performance of job duties at the time (e.g. going to or coming from employer's worksite). Recent Missouri cases have applied the retained extension of premises doctrine and confirmed that compensation is not limited to workers injured while actively engaged in their duties. *E.g.*, *Viley*, 452 S.W.3d 680; *Duever v. All Outdoors, Inc.*, 371 S.W.3d 863 (Mo. App. E.D. 2012); *Dorris v. Stoddard County*, 436 S.W.3d 586 (Mo. App. S.D. 2014).

In *Viley*, the claimant was awarded compensation for an injury he sustained when he fell on ice on a parking lot controlled by employer while he was walking to his car at the conclusion of his work shift. *Viley*, 452 S.W.3d at 681-82. The *Viley* court distinguished *Hager v. Syberg's Westport*, 304 S.W.3d 771 (Mo. App. E.D. 2010), in which the claimant also slipped on ice in the parking lot while walking from his place of employment to his car, but the *Hager* court found that, based on the definition of "control" and the provisions of the employer's lease, the employer did not "exercise power or influence" over the parking lot and did not "regulate or govern" it. 452 S.W.3d at 684.

In *Hager*, the lease granted the employer the "right to use" parking facilities that were shared with occupants and guests of other premises. 304 S.W.3d at 776. It provided that landlord was in charge of managing and maintaining the premises and reserved to landlord the right to make changes or alterations to the premises for common use among tenants and to make rules and regulations as to the use of the parking areas by all those authorized to use them. *Id.* at

5

776-77. In *Viley*, on the other hand, the lease provided employer "exclusive use for parking of Tenant's Automobiles" in the subject parking lots. 452 S.W.3d at 684. Furthermore, the lots at issue were expressly governed by separate provisions from areas of common use, which were subject to the exclusive control and management of the landlord. *Id.* at 684 n.6.

In addition to analyzing the lease provisions, both the *Hager* court and the court in *Viley* discuss the course of conduct of the employers and landlords as relevant to the issue of control. *Hager*, 304 S.W.3d at 777; *Viley*, 452 S.W.3d at 685. In *Hager*, the court mentioned that the landlord *permitted* the employer and its employees and guests to choose their own parking spaces, while the landlord retained ultimate control over parking decisions. 304 S.W.3d at 777. In *Viley*, although the court ultimately decides the "exclusive use" lease provision is sufficient to establish control for purposes of the extended premises statutory provision, it includes a discussion of evidence regarding the course of conduct pertaining to the subject parking lots as showing that employer "was authorized to, and did, exercise power over, regulate, and govern the lots." 452 S.W.3d at 685. The employer had at times ejected non-employees from the lots, regularly contacted the landlord requesting maintenance for the lots, which the landlord was obligated to provide pursuant to the lease, occasionally complained of the snowy and icy condition of the lots to the landlord, and required certain employees to report unsafe driving incidents occurring in the lots to a supervisor. *Id.*

Here, DSS leased the subject parking lot, along with the office building in which Ms. Beem worked, from Blandwal, Incorporated ("Blandwal"). The lease contained the following provisions relevant to analysis of control of the parking lot:

> The LESSOR agrees to provide 23 parking spaces located on the premises or within a reasonable distance from the premises.

6

> The LESSOR agrees to direct and pay for removal of snow and ice from the sidewalks and parking area and to provide and pay for general lawn care.

The lease also provides that DSS had the right to transfer its interest in the lease, including the parking lot, to other governmental entities without Blandwal's approval.

The Commission found that the language of the lease between Blandwal and DSS distinguished it from that in *Hager*. In *Hager*, the subject lot was a common area under the lease terms, 304 S.W.3d at 776, whereas the lot in the instant case was not. The *Hager* lease explicitly provided "exclusive control" of the common area parking lot to the landlord, whereas the lease between Blandwal and DSS makes no such provision, granting only that landlord would provide the parking spots and direct and pay for snow and ice removal in the area. Another important difference is the *Hager* lease's provision that the landlord had the power to make rules and regulations regarding the use of the subject lot, as opposed to the lease between Blandwal and DSS, under which Blandwal does not have the authority to make rules about DSS's use of the lot. Furthermore, the *Hager* lease provided the subject lot would be managed and maintained under the landlord's supervision, as opposed to the lease here which gives Blandwal no such authority, but rather obligates Blandwal to clear the lot of snow and ice.

In sum, the lease between Blandwal and DSS provides very limited retention of control rights to Blandwal, and, granting use of the lot only to DSS without explicitly reserving for itself any particular rights as to the lot, in effect accords such rights to DSS. The possibility that Blandwal could move the parking spaces within a reasonable distance does not show that DSS did not control the lot. *See, Hardesty v. Mr. Cribbin's Old House, Inc.*, 679 S.W.2d 343, 346-47 (Mo. App. E.D. 1984) (holding that tenant had exclusive control of the portion of the lot upon which the parking spots guaranteed by the landlord were located where the lease contained a provision allowing the landlord to change the location of the spaces). The lease language

7

supports the Commission's finding of DSS's control of the lot sufficient to bring it under the extension of premises doctrine.

As to the course of conduct of Blandwal and DSS regarding the lot, the Commission found that Blandwal did not promptly clear snow and ice during the course of the lease, and when such delay occurred, many times employees of DSS, including Ms. Beem, cleared the sidewalks in the lot with supplies purchased with their own funds. On one occasion Ms. Beem was told to contact the landlord when the parking lot and sidewalks were not cleared, and it was discovered that the landlord had no one scheduled to remove snow at the lot. Ms. Beem contacted a snow removal contractor to clear the lot at that time. The foregoing conduct supports the Commission's conclusion that DSS controlled the lot by governing the condition of the lot and exercising power and influence over the lot in hiring the contractor for clearance when Blandwal did not provide it. The course of conduct between the parties to the lease supports the Commission's finding that DSS controlled the lot sufficient to bring it under the extension of premises doctrine.

**Equal Exposure**

Concluding that the extension of premises doctrine applies to Ms. Beem's injury, we proceed to the determination of whether her injury arises out of and in the course of employment pursuant to section 287.020.3(2). Section 287.020.3(2) controls this determination, providing that

> [a]n injury shall be deemed to arise out of and in the course of the employment only if:
>
> (a) It is reasonably apparent, upon consideration of all the circumstances, that the accident is the prevailing factor in causing the injury; and

8

(b) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life.

DSS does not contest that the February 1, 2010, accident was the "prevailing factor" in causing Ms. Beem's injury. Thus, the remaining issue is limited to the construction and application of section 287.020.3(2)(b). Under paragraph (b), if Ms. Beem's injury did not come from a hazard or risk unrelated to the employment to which she would have been equally exposed outside of, and unrelated to, the employment in her nonemployment life, then her injury arose out of and in the course of employment. *See* § 287.020.3(2)(b).

The equal exposure consideration should center on whether the employee was injured *because* he or she was at work, rather than simply *while* he or she was at work. *Viley*, 452 S.W.3d at 686. The focus of the equal exposure analysis should be not on *what the employee was doing* when the injury occurred, but rather on whether the *risk source* of the injury was one to which the employee is exposed equally in his or her nonemployment life. *Id.* (citing *Johme v. St. John's Mercy Healthcare*, 366 S.W.3d 504, 511 (Mo. banc 2012)).

DSS contends that Ms. Beem failed to prove that she was not equally exposed to the risk or hazard causing her injury in her nonemployment life. DSS argues that Beem's risk source was walking on *an* icy parking lot and that being exposed to *an* icy parking lot is a hazard or risk to which Ms. Beem was equally exposed in her nonemployment life. DSS further argues that it was Ms. Beem's burden to prove that she was not equally exposed to icy parking lots, or in the alternative, at least that she was not equally exposed to the icy parking lot in which she was injured, in her nonemployment life, and that she failed to do so.[1]

---

[1] DSS's argument treats the analyses of "hazard or risk" in *Hager* and *Viley* as inconsistent, and seems to indicate that either might apply here; however, the *Viley* court addressed the issue in a footnote:

9

DSS's argument is contrary to decided cases. As noted by the *Viley* court,

> [e]ven assuming *arguendo* that [employee] was equally exposed to the hazard of slipping and falling on *an* icy parking lot in his nonemployment life, his injury still arose out of his employment because there is nothing in the record to support a conclusion that he was equally exposed to the hazard of slipping on the icy parking lot at *that particular* work site in his nonemployment life.

452 S.W.3d at 687; *see also*, *Duever*, 371 S.W.3d at 867-68; *Dorris*, 436 S.W.3d at 592 ("the hazard was not the hazard of slipping on ice in general, but the hazard of slipping on that ice in that particular parking lot") (citing the implicit ruling in *Duever*).

> Furthermore, as noted by this Court in *Young v Boone Electric Cooperative*:

> A claimant is not required to prove both that the hazard from which her injury arose was related to her employment and that the hazard was one which she was not equally exposed to in her nonemployment life. Rather, the claimant has the burden of proving that her injury "was caused by [a] risk related to her employment activity *as opposed to* a risk to which she was equally exposed in her 'normal nonemployment life.'" *Johme*, 366 S.W.3d at 512 (emphasis added). Meaning, implicit in a finding that the claimant was exposed to the risk from which her injury arose *because* of her employment, is a finding that the claimant could have avoided the risk outside of her employment.

462 S.W.3d 783, 790 n.9 (Mo. App. W.D. 2015).

Here, Ms. Beem established that her injury arose from the hazard of slipping on the ice that had refrozen on the parking lot controlled by DSS. Ms. Beem established that being employed at DSS exposed her to that particular hazard, in that DSS employees parked in the subject lot and had to use it in order to come and go from DSS's office each work day. Therefore, she proved that the hazard was related to her employment. The Commission's "fail[ure] to do any analysis as to whether Beem was equally exposed to the parking lot in her

---

*Hager* was decided before *Johme*, *Duever*, and *Dorris*, does not distinguish *Miller* [*v. Mo. Highway & Transp. Comm'n*, 287 S.W.3d 671, 672–74 (Mo. banc 2009)], and does not examine whether the employee was exposed to the risk of that *particular* icy parking lot in his employment versus nonemployment life.

452 S.W.3d at 687 n.9. The analysis in *Viley*, which does account for all relevant precedent mentioned above, is binding precedent rather than the broader test used in *Hager*.

normal nonemployment life" merely indicated that DSS failed to point to any evidence tending to disprove the prima facie case already made by Ms. Beem.

### Conclusion

For all the reasons stated above, Ms. Beem's injury arose out of and in the course of her employment. Accordingly, the Commission did not err in awarding Ms. Beem benefits for her 2010 ankle injury. The judgment is affirmed.


_____
VICTOR C. HOWARD, JUDGE

All concur.

11